**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-4227

JUSTIN ZIKA,

Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LARIMER, COLORADO;
JOHN FEYEN, in his official capacity as Sheriff of Larimer County, Colorado;
CORRHEALTH, PLLC;
HEALTH ADVOCATES NETWORK, INC.;
MARKITA GONZALES, LPN, in her individual capacity;
ASHLIE DICKERSON, RN, in her individual capacity;
ALEX MAHLOCH, RN, in his individual capacity;
STEPHANIE NERVAIS, RN, in her individual capacity;
LORENZA FRIAS, PMHNP, in her individual capacity;
LEAH POLLOCK, ARNP, in her individual capacity;
KELSEY KNIGHT, LPN, in her individual capacity;
JOHN THIESZEN, MD, in his individual capacity; and
JOHN DOE DEPUTIES 1–3, in their individual capacities,

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Justin Zika, by and through his attorneys, Bryan & Terrill Law, PLLC, for his Complaint against Defendants, alleges as follows:

# I.

# PARTIES

1. Plaintiff Justin Zika is a natural person and citizen of the State of Colorado who resides at 6530 Virgil Way, Arvada, Colorado 80007.

2. Defendant Board of County Commissioners of the County of Larimer (the "County") is the governing body of Larimer County, a public entity and political subdivision of the State of Colorado, and is the proper entity through which Larimer County is sued under C.R.S. § 30-11-105. The County operates and is responsible for the Larimer County Jail (the "Jail").

3. Defendant John Feyen is the duly elected Sheriff of Larimer County and is sued in his official capacity. Under C.R.S. § 30-10-511, the Sheriff has charge and custody of the Jail and is responsible for its operation. The County and the Sheriff are referred to together as the "County Defendants."

4. Defendant CorrHealth, PLLC ("CorrHealth"), is a foreign professional limited liability company authorized to do business in Colorado that, at all relevant times, contracted with the County and/or the Sheriff to provide medical and mental-health care to detainees at the Jail. CorrHealth acted at all relevant times by and through its employees and agents, including physicians, nurse practitioners, nurses, and other medical staff, who were acting within the course and scope of their employment or agency, and consistent with CorrHealth policies or customs.

5. Defendant Health Advocates Network, Inc. ("Health Advocates Network"), is a foreign corporation with its principal place of business at 1875 N.W. Corporate Boulevard, Suite 120, Boca Raton, Florida, and is authorized to do business in Colorado through its registered agent, CT Corporation System, 7700 E. Arapahoe Road, Suite 220, Centennial, Colorado. Upon information and belief, at all relevant times CorrHealth used Health Advocates Network to staff

the Jail with temporary medical and nursing personnel, including nurses who provided care to Plaintiff; the Jail's medication records identify several of the nurses who administered Plaintiff's lithium as agency personnel. Health Advocates Network acted at all relevant times by and through its employees and agents, who were acting within the course and scope of their employment or agency, and and consistent with CorrHealth policies or customs. (CorrHealth and Health Advocates Network are referred to together as the "Medical Defendants.")

6. Defendants Ashlie Dickerson, RN; Alex Mahloch, RN; Markita Gonzales, LPN; Stephanie Nervais, RN; Lorenza Frias, PMHNP; Leah Pollock, ARNP; Kelsey Knight, LPN; and John Thieszen, MD, are licensed health-care professionals who, at all relevant times, provided medical or mental-health care to Plaintiff at the Jail as employees or agents of CorrHealth and/or Health Advocates Network, acting within the course and scope of that employment or agency. Each is sued individually. (These defendants are referred to together as the "Individual Provider Defendants.")

7. Defendants John Doe Deputies 1 through 3 are deputies of the Larimer County Sheriff's Office whose true identities are presently unknown to Plaintiff. At all relevant times each was employed by the County and/or the Sheriff, was assigned to the housing unit in which Plaintiff was confined or to the handling of telephone communications directed to the Jail's medical unit, and was acting under color of state law. Upon information and belief, each is a "peace officer" within the meaning of C.R.S. § 24-31-901(3). Plaintiff will amend to substitute their true names upon identification through discovery. (Defendants John Doe Deputies 1 through 3 are referred to as the "Deputy Defendants.")

## II.

## JURISDICTION AND VENUE

8. This Court has original subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), which arise under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

9. This Court has supplemental jurisdiction over Plaintiff's Colorado state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same case or controversy, Plaintiff's confinement, medication, and medical care at the Jail between September 3 and September 16, 2025, as the federal claims.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred at the Larimer County Jail in Larimer County, Colorado, and under 28 U.S.C. § 1391(b)(1) because Defendants reside in or are subject to personal jurisdiction in this District.

11. Plaintiff has complied with the notice-of-claim requirement of the Colorado Governmental Immunity Act ("CGIA"), C.R.S. § 24-10-109. Plaintiff discovered his injuries on or about September 16, 2025, when a critical serum lithium level was resulted and he was transferred from the Jail to the hospital. Plaintiff served written notice of claim on Larimer County, through its designated agent, on March 4, 2026, within 182 days of that date. The notice identified the claimant, counsel, the place and approximate time of the events, the administration of lithium to Plaintiff at the Jail, the resulting medical complications, his emergency transfer to Poudre Valley Hospital, and the damages claimed.

12. Plaintiff's claims under C.R.S. § 13-21-131 and the Colorado Constitution, and his negligence claims, are brought under this Court's supplemental jurisdiction. The notice

requirement of C.R.S. § 24-10-109 does not apply to Plaintiff's claim under C.R.S. § 13-21-131, and qualified immunity is not a defense to that claim. See C.R.S. § 13-21-131(2)(b). Neither CorrHealth nor Health Advocates Network, as private entities, is entitled to qualified immunity on Plaintiff's claims under 42 U.S.C. § 1983.

**III.**

**GENERAL ALLEGATIONS**

13. On or about August 8, 2025, Plaintiff was admitted to AdventHealth Porter Hospital, where he was diagnosed with bipolar I disorder with mania and started on lithium and olanzapine.

14. Lithium was a new medication for Plaintiff.

15. Porter prescribed lithium carbonate in extended-release form, lithium ER 450 mg, two tablets twice daily, and, before discharge on or about August 13, 2025, obtained a serum lithium level of 1.25, within the therapeutic range.

16. Porter discharged Plaintiff on that regimen and monitored him on it.

17. Lithium has a narrow therapeutic index, and serum levels must be monitored to detect accumulation before it becomes toxic.

18. The accepted standard of care requires a baseline serum level shortly after initiation or any change in dose.

19. CorrHealth's own written monitoring guideline, set out in the psychiatric progress-note form used in Plaintiff's own chart, states for lithium: "For Initiation of medication: CBC with diff, CMP, TSH for baseline[;] Lithium level 1-2 weeks after initiation or dose changes[;] EKG (if age>40 y/o)."

20. Plaintiff was forty-four years old at the time.

21. On or about September 3, 2025, Plaintiff surrendered to custody and became a pretrial detainee at the Jail (Booking No. B2507612).

22. At intake on September 3, 2025, Jail medical staff recorded Plaintiff's medications.

23. Plaintiff's own report listed a lower lithium dose ("400 mg" twice daily), while staff verified, through the Contexture health-information exchange, a prescription for lithium ER 450 mg, two tablets twice daily (900 mg twice daily).

24. Plaintiff's mother, Jill Zika, spoke with the intake nurse and informed her that lithium was a new medication for Plaintiff that needed to be monitored.

25. Jail medical staff did not reconcile the discrepancy between the reported and verified doses.

26. They entered an order for lithium carbonate (Eskalith) 300 mg, three capsules twice daily, which a Jail physician approved on or about September 4, 2025.

27. No baseline serum lithium level and no electrocardiogram were ordered at intake or with that approval.

28. The medication the Jail administered was not the medication that had been verified.

29. The verified outside prescription was for an extended-release lithium preparation; the Jail ordered and administered an immediate-release lithium preparation at the same total daily dose.

30. Immediate-release and extended-release lithium do not behave the same way in the body: the immediate-release form produces higher peak serum concentrations and wider swings in serum level.

31. Substituting one for the other is a change in the medication regimen that, under the standard of care and under CorrHealth's own written guideline, called for a serum level within one to two weeks.

32. From September 3, 2025 forward, the Medical Defendants administered lithium 900 mg twice daily to Plaintiff, including through temporary nursing staff supplied by Health Advocates Network.

33. Despite the recent initiation of the medication, the maximum dose, the change in formulation, the unreconciled discrepancy between Plaintiff's reported dose and the verified prescription, and the standard of care requiring a baseline level, Defendants did not obtain a serum lithium level for approximately twelve days.

34. During this period, Plaintiff developed signs of lithium toxicity, including tremor and shaking of the hands, myoclonic jerking, disorientation, difficulty focusing his eyes and an inability to read, and increased water intake, and on the evening of September 12, 2025 he suffered an atypical panic attack.

35. Plaintiff and his mother reported these concerns to Jail officers and medical staff. Plaintiff reported to Jail staff that his lithium level felt too high.

36. On or about Friday, September 12, 2025, Jill Zika telephoned the Jail and asked to speak with the medical unit about urgent information concerning her son.

37. The deputy she spoke with told her that she could not speak to medical, that no supervisor was available, and that her request could not be documented.

38. On or about Saturday, September 13, 2025, she reached a member of the Jail's medical staff, Defendant Markita Gonzales, LPN, and reported that Plaintiff was experiencing shaking in his hands and difficulty focusing his eyes, that he had a new diagnosis of bipolar I with

mania, that he had not had laboratory testing since August 15, 2025, and that his lithium level needed to be checked.

39. According to Plaintiff's contemporaneous reports to his mother, when he raised these complaints with Jail officers and nurses he was told to drink more water.

40. The Jail's own records confirm that Ms. Zika's September 13, 2025 call was received and documented, and that nothing was done in response.

41. A CorrHealth medical note entered by Defendant Gonzales at 5:02 p.m. on September 13, 2025 records that "Patient's mother called with concerns about inmate and his current well being," that "patient has not had labs drawn since August 15 of this year," and that "[p]atient has stated to his mother that he's experiencing 'shakes in his hands' difficulty focusing his eyes, and has a new diagnosis of Bipolar 1 with mania."

42. The only response the note records is that Ms. Zika "was informed that he does have access to medical at this facility and will be checked on every day" and that "[p]atient was educated about the process of requesting medical care while here."

43. No serum lithium level was drawn in response to that call, no provider evaluation was triggered, and the report was not escalated to anyone with authority to order laboratory testing.

44. The Jail's records contain no documentation whatever of Ms. Zika's September 12, 2025 call or of the deputy's refusal to receive, document, or relay her report.

45. At no relevant time did Defendants maintain an adequate system or method by which a detainee or a detainee's family could report an urgent medical concern and ensure that it reached, and was acted upon by, a provider with authority to order laboratory testing or to evaluate the detainee.

46. A serum lithium level was not ordered until on or about September 13, 2025.

47. Once ordered, it was not drawn until 8:38 a.m. on September 15, 2025, and the result was not received until 9:20 a.m. on September 16, 2025, when it returned at a critical level of 3.7 mmol/L against a reference range of 0.6–1.2, flagged critical and verified by repeat analysis.

48. Approximately two days therefore elapsed between the order and the blood draw, and approximately twelve days elapsed between Plaintiff's first dose at the Jail and any measurement of his serum lithium.

49. Defendants then discontinued the lithium and transferred Plaintiff to Poudre Valley Hospital that afternoon.

50. On evaluation at the Jail on September 16, 2025, before transfer, Plaintiff was observed to have hand tremors and myoclonus, and an electrocardiogram showed sinus rhythm with a prolonged QT interval of 469 milliseconds.

51. No electrocardiogram had been obtained at any earlier point during Plaintiff's confinement, notwithstanding CorrHealth's own written guideline calling for one on initiation of lithium in a patient over forty years of age.

52. At Poudre Valley Hospital, Plaintiff's serum lithium level continued to rise, peaking at 4.7 mmol/L against a reference range of 0.6–1.2.

53. He was admitted from September 16 to September 23, 2025.

54. On September 18 his mental status worsened and he became disoriented, he developed a fever, and a bladder scan showed one liter of retained urine requiring straight catheterization; his providers worked him up for neuroleptic malignant syndrome.

55. His oxygen requirement worsened on September 19, rising to eight liters of supplemental oxygen, with chest imaging showing rapid interval development of perihilar consolidation.

56. His discharge diagnoses were lithium toxicity with neurologic effects, acute hypoxic respiratory failure, acute urinary retention, and bipolar disorder.

57. As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered acute lithium toxicity and its neurologic and systemic complications, a seven-day hospitalization, and continuing residual injuries, including neuromuscular symptoms, the full nature and extent of which are not yet known.

58. Had Defendants obtained and acted on a timely serum lithium level, as the standard of care and CorrHealth's own protocol required, Plaintiff's rising lithium level would have been detected and corrected before it reached a toxic level and before he suffered these injuries.

## IV.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Fourteenth Amendment
### Deliberate Indifference to Serious Medical Needs
(*Against Defendant Markita Gonzales, LPN*)

59. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

60. At all relevant times Plaintiff was a pretrial detainee, and his right to adequate medical care arose under the Due Process Clause of the Fourteenth Amendment.

61. Defendant Gonzales, though employed by a private entity, acted under color of state law in providing medical care to detainees at the Jail, a traditionally exclusive public function delegated to CorrHealth and Health Advocates Network by the County and the Sheriff. She is not entitled to qualified immunity.

62. Plaintiff's medical need was objectively serious. He was receiving the maximum dose of a recently initiated, narrow-therapeutic-index medication, in a formulation different from the one verified, with no serum level ever having been obtained.

63. Untreated lithium accumulation carries a substantial risk of neurologic injury, organ failure, and death, and in fact produced a serum level of 3.7 mmol/L at the Jail and 4.7 mmol/L at the hospital, acute hypoxic respiratory failure, acute urinary retention, and a seven-day hospitalization.

64. Defendant Gonzales was subjectively aware of facts from which the inference of a substantial risk of serious harm could be drawn, and she drew that inference.

65. On September 13, 2025 she personally received and recorded a report that Plaintiff was experiencing "shakes in his hands" and "difficulty focusing his eyes," that he carried a new diagnosis of bipolar I with mania, that he had received no laboratory testing since August 15, 2025, and that his mother believed his lithium level required checking.

66. She recorded those facts contemporaneously in Plaintiff's chart in her own medical note.

67. Defendant Gonzales also knew, or was chargeable with knowledge of, CorrHealth's own written lithium-monitoring guideline, which appeared on the psychiatric progress-note form in Plaintiff's own chart and required a serum lithium level one to two weeks after initiation or any dose change.

68. That guideline creates no constitutional right, but it is evidence that Defendant Gonzales and her employer understood the risk that unmonitored lithium presents.

69. Defendant Gonzales was a gatekeeper to care. She had the ability and the responsibility to relay the report to a provider with authority to order a serum level, to request such an order, or to have Plaintiff evaluated. She did none of those things.

70. The only response her note records is that Plaintiff's mother "was informed that he does have access to medical at this facility and will be checked on every day" and that Plaintiff "was educated about the process of requesting medical care while here."

71. By receiving a report of the recognizable symptoms of lithium toxicity in a patient she knew to be receiving lithium without monitoring, and responding by explaining how to submit a request form, Defendant Gonzales consciously disregarded an excessive risk to Plaintiff's health.

72. As a direct and proximate result of Defendant Gonzales's deliberate indifference, Plaintiff's lithium level continued to rise unchecked for a further three days before any specimen was drawn, and he suffered the injuries and damages described above.

73. Defendant Gonzales's conduct was undertaken maliciously, willfully, or with reckless or callous disregard of Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

**SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983 — Fourteenth Amendment**

**Entity Liability — Systemic Failure of Medical Policies and Procedures**

(*Against Defendants CorrHealth, PLLC and Health Advocates Network, Inc.*)

74. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

75. This claim is brought against CorrHealth and Health Advocates Network for their own systemic failures. It is not predicated on, and does not depend upon, a determination that any individual employee or agent of either entity is personally liable to Plaintiff.

76. CorrHealth and Health Advocates Network acted under color of state law in performing the traditionally exclusive public function of providing medical and mental-health care to detainees at the Jail, and each is a person subject to suit under 42 U.S.C. § 1983.

77. Deliberate indifference to serious medical needs may be shown by proving gross deficiencies in staffing, facilities, equipment, or procedures such that a detainee is effectively denied access to adequate medical care. Where an entity's policies devolve responsibility across multiple employees so that no single employee is positioned to prevent the constitutional violation, and the sum of those employees' acts and omissions produces the violation, the entity is directly liable.

78. The Medical Defendants maintained such gross deficiencies in their procedures at the Jail. First, they promulgated a written lithium-monitoring guideline but maintained no procedure by which that guideline was assigned to any person, triggered by any event, tracked, or enforced.

79. Responsibility for Plaintiff's lithium was divided among an intake nurse, a verifying nurse, a medical assistant, at least four medication-administration nurses including agency personnel, a treating nurse, and a psychiatric provider, and no one among them owned the obligation to obtain a baseline serum level, and for twelve days no one did.

80. Second, the Medical Defendants maintained no procedure requiring reconciliation when the medication actually ordered and administered differed in formulation from the outside prescription their own staff had verified.

81. Plaintiff's extended-release lithium prescription was verified through the Contexture health information exchange on September 3, 2025; an immediate-release preparation

was ordered and administered instead; and no procedure existed to flag that substitution or to adjust monitoring in response to it.

82. Third, the Medical Defendants maintained no procedure by which an urgent medical report from a detainee or a detainee's family reached a provider with authority to order diagnostic testing.

83. A detailed report of the symptoms of lithium toxicity was received on September 13, 2025 and went no further than the nurse who took the call.

84. The only mechanism the Medical Defendants made available was an inmate request form.

85. Fourth, upon information and belief, the Medical Defendants staffed the Jail with temporary agency personnel supplied by Health Advocates Network without any procedure ensuring that such personnel knew, or were supervised in accordance with, CorrHealth's medication-monitoring requirements.

86. These deficiencies were not the product of any individual's oversight. They were the predictable consequence of the way the Medical Defendants structured the delivery of care at the Jail, and they effectively denied Plaintiff access to adequate medical care.

87. The Medical Defendants acted with deliberate indifference. CorrHealth authored the lithium-monitoring guideline and printed it on the very form its psychiatric providers use, and therefore knew that unmonitored lithium in a newly initiated patient presents a substantial risk of serious harm.

88. Having identified that risk in writing, the Medical Defendants consciously failed to build any system to address it.

89. As a direct and proximate result of these systemic failures, Plaintiff received lithium at the maximum dose for twelve days without any serum level, developed acute lithium toxicity, and suffered the injuries and damages described above.

90. Had any procedure existed to execute the Medical Defendants' own guideline, a serum level would have been obtained within one to two weeks of initiation and Plaintiff's accumulating level would have been detected and corrected before it became toxic.

**THIRD CLAIM FOR RELIEF**

**42 U.S.C. § 1983 — Fourteenth Amendment**

**Entity Liability — Failure to Train and Supervise (Pleaded in the Alternative)**

(*Against Defendants CorrHealth, PLLC and Health Advocates Network, Inc.*)

91. Plaintiff incorporates the preceding paragraphs as if fully set forth herein. This claim is pleaded in the alternative to the Second Claim for Relief.

92. The Medical Defendants were responsible for training and supervising the licensed practical nurses, registered nurses, and agency personnel who administered medication and received medical complaints at the Jail, including with respect to their legal duty not to violate the constitutional rights of detainees in their care.

93. The Medical Defendants failed to train and supervise those personnel adequately. The nurses who administered Plaintiff's lithium twice daily for twelve days, and the nurse who received the September 13, 2025 report of his symptoms, lacked the knowledge, tools, preparation, and authority necessary to recognize the signs of lithium toxicity, to appreciate the significance of an unmonitored narrow-therapeutic-index medication, and to obtain or escalate a request for a serum level.

94. The risk that such personnel would fail to respond adequately to the recurring medical needs of detainees receiving high-risk medications was obvious. Correctional nursing staff

predictably and regularly encounter detainees on narrow-therapeutic-index medications requiring serum monitoring, and the Medical Defendants' own written guideline demonstrates their awareness of that recurring situation.

95. Given the regular nature of these encounters, the Medical Defendants knew to a moral certainty that staff would encounter detainees on narrow-therapeutic-index medications, they knew training on how to medically manage this class of inmates in a correctional setting would be helpful, and they knew that failure to provide such training would often result in the inmate suffering substantial harm.

96. The Medical Defendants' failure to train and supervise amounted to deliberate indifference to the rights of detainees with whom their personnel come into contact, and was the moving force behind the violation of Plaintiff's rights.

97. As a direct and proximate result, Plaintiff suffered the injuries and damages described above.

**FOURTH CLAIM FOR RELIEF**
**Negligence — Negligent Operation of a Jail (C.R.S. § 24-10-106(1)(b))**
*(Against the County Defendants)*

98. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

99. The County Defendants operate the Jail. Sovereign immunity is waived under C.R.S. § 24-10-106(1)(b) for injuries resulting from the operation of a jail by a public entity.

100. As the public entity and official responsible for the custody and care of detainees at the Jail, the County Defendants owed Plaintiff, a pretrial detainee in their custody, a non-delegable duty to exercise reasonable care for his health and safety, including the safe administration and monitoring of medication and the provision of timely access to medical care.

101. The County Defendants' delegation of medical care to a private contractor does not relieve them of that duty.

102. The County Defendants breached that duty by, among other things: continuing to administer a maximum dose of a recently initiated, narrow-therapeutic-index medication without obtaining a timely serum lithium level; substituting an immediate-release lithium preparation for the verified extended-release preparation without reconciliation or monitoring; failing to obtain a baseline electrocardiogram as their own guideline required for a patient over forty; failing to monitor Plaintiff's serum lithium level for approximately twelve days despite the recent initiation, the maximum dose, the change in formulation, and the discrepancy between Plaintiff's reported dose and the verified prescription; failing to draw the level promptly even after it was ordered; failing to recognize and respond to developing signs of lithium toxicity; failing to maintain an adequate system to receive, document, escalate, and act upon urgent medical concerns reported by detainees and their families; refusing to receive, document, and act upon the specific warnings of Plaintiff and his mother; instructing Plaintiff to drink more water rather than evaluating him or obtaining a serum level; failing to ensure adequate medical monitoring of detainees; failing to adequately train and supervise Jail and medical staff; and failing to obtain timely emergency care.

103. As a direct and proximate result of the County Defendants' negligence, Plaintiff suffered the injuries and damages described above, in amounts to be proven at trial and within the limits of C.R.S. § 24-10-114.

104. Plaintiff complied with the notice-of-claim requirement of C.R.S. § 24-10-109 as alleged above.

**FIFTH CLAIM FOR RELIEF**

**Negligence (Professional Negligence; Respondeat Superior)**

*(Against the Medical Defendants and the Individual Provider Defendants)*

105. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

106. The Medical Defendants, directly and through their employees and agents, and the Individual Provider Defendants personally, undertook to provide medical and mental-health care to Plaintiff and thereby owed him a duty to exercise the degree of knowledge, skill, and care ordinarily used by reasonably careful correctional medical providers under the same or similar circumstances, including with respect to the administration and monitoring of high-risk medications such as lithium.

107. The Medical Defendants, by and through their employees and agents, breached that duty by, among other things: administering a maximum dose of recently initiated lithium without obtaining a timely baseline serum level as the standard of care and CorrHealth's own written guideline required; substituting an immediate-release lithium preparation for the verified extended-release preparation without reconciliation, without adjusting monitoring, and without obtaining a serum level; failing to obtain the baseline electrocardiogram their own guideline required for a patient over forty; failing to monitor Plaintiff's serum lithium level for approximately twelve days; failing to reconcile the discrepancy between Plaintiff's reported dose and the verified prescription; failing to draw the ordered serum level for two days after it was ordered; failing to recognize and respond to developing signs of lithium toxicity and to the specific reports of Plaintiff and his mother; failing to obtain a serum level or evaluation promptly even after Plaintiff reported that his level felt too high; and failing to timely refer or transfer Plaintiff for emergency care.

108. The medical and nursing personnel who provided care to Plaintiff were employees or agents of CorrHealth and/or Health Advocates Network, acting within the course and scope of their employment or agency. CorrHealth and Health Advocates Network are each vicariously liable for the negligent acts and omissions of those personnel under the doctrine of respondeat superior.

109. Each Individual Provider Defendant is separately liable for his or her own negligent acts and omissions, including: Defendant Mahloch, who verified the outside prescription for extended-release lithium through Contexture on September 3, 2025 without reconciling it against the immediate-release preparation the Jail ordered and without obtaining a baseline serum level; Defendant Dickerson, who conducted the intake screening and received Ms. Zika's report that lithium was newly prescribed and required monitoring; Defendant Gonzales, who received Ms. Zika's September 13, 2025 report of tremor and visual disturbance and neither obtained a serum level nor escalated the report to a provider; Defendant Nervais, who evaluated Plaintiff on September 13, 2025 after he reported that his lithium level was too high and deferred the question of a lithium level to a psychiatric provider rather than obtaining one; Defendants Frias, Pollock, and Thieszen, who as prescribing and supervising providers approved and continued a maximum dose of recently initiated lithium without a baseline serum level or electrocardiogram; and Defendant Knight, who administered lithium to Plaintiff without regard to the absence of any monitoring.

110. The Medical Defendants are private entities and independent contractors and are not "public employees" within the meaning of C.R.S. § 24-10-103(4)(a); they are therefore not entitled to immunity under the CGIA. In the alternative, and only to the extent a Medical Defendant is deemed a public employee under the CGIA, its acts and omissions were willful and wanton.

111. As a direct and proximate result of the Medical Defendants' negligence, Plaintiff suffered the injuries and damages described above, in amounts to be proven at trial.

**SIXTH CLAIM FOR RELIEF**

**Negligence (Corporate / Systemic Negligence)**

*(Against the Medical Defendants)*

112. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

113. The Medical Defendants owed Plaintiff an independent duty to adopt and maintain adequate policies, procedures, staffing, training, and supervision reasonably necessary to provide medically adequate care to detainees, including the safe administration and serum-level monitoring of high-risk medications such as lithium.

114. The Medical Defendants breached that duty by, among other things: failing to adopt, implement, or enforce adequate policies and procedures for medication administration and serum-level monitoring, and deviating from their own protocols; failing to adequately train, staff, and supervise the medical and nursing personnel providing care at the Jail, including temporary personnel supplied by Health Advocates Network; and failing to maintain any adequate system or method by which detainees and their families could report an urgent medical concern and ensure that it reached, and was acted upon by, a provider.

115. As a direct and proximate result of the Medical Defendants' negligence, Plaintiff suffered the injuries and damages described above, in amounts to be proven at trial.

**SEVENTH CLAIM FOR RELIEF**
**Deprivation of Rights Secured by the Colorado Constitution**
**(C.R.S. § 13-21-131; Colo. Const. art. II, §§ 20 and 25)**
(*Against the Deputy Defendants*)

116. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

117. Plaintiff brings this claim against Defendants John Doe Deputies 1 through 3 in their individual capacities.

118. At all times relevant hereto, the Deputy Defendants were acting under color of state law in their capacity as deputies of the Larimer County Sheriff's Office.

119. Each Deputy Defendant is a "peace officer" as defined by C.R.S. § 24-31-901(3).

120. Plaintiff had a right under Article II, Section 20 of the Colorado Constitution to be free from cruel and unusual punishment, including the right to receive adequate medical care while incarcerated.

121. Section 13-21-131 being a relatively new statute, the Colorado Supreme Court has not determined the precise standard governing claims under Article II, Section 20 of the Colorado Constitution, and specifically has not determined whether that right includes the right of a detainee to receive objectively reasonable medical care, or non-deliberately indifferent medical care. This is therefore a matter of first impression. See C.R.S. § 13-17-201(2).

122. The Colorado Supreme Court likewise has not determined whether the right to due process under Article II, Section 25 of the Colorado Constitution includes the right of a pretrial detainee to receive objectively reasonable or non-deliberately indifferent medical care. See C.R.S. § 13-17-201(2).

123. Plaintiff had a constitutional right under Article II, Sections 20 and 25 of the Colorado Constitution to receive objectively reasonable and non-deliberately indifferent medical

care, and to have an urgent report of a developing medical emergency received, documented, and referred to a medical provider by deputies who are themselves unlicensed and untrained in the recognition and management of medication toxicity.

124. The Deputy Defendants were aware of a substantial risk of serious harm to Plaintiff. Plaintiff reported directly to deputies that he was experiencing tremor, shaking of the hands, difficulty focusing his eyes and an inability to read, and that he believed his lithium level was too high.

125. Deputies observed that Plaintiff had stopped eating, to the point that custody staff reported his refusal of meals to the medical unit and a meal watch was instituted.

126. On September 12, 2025, a deputy was told directly by Plaintiff's mother that she had urgent medical information concerning her son and needed to reach the medical unit.

127. That deputy refused to connect her to medical, told her that no supervisor was available, told her that her request could not be documented, and neither recorded nor relayed the report to anyone.

128. Rather than referring Plaintiff to a medical provider, obtaining an evaluation, or transmitting the reports they received, the Deputy Defendants disregarded the risk and told Plaintiff to drink more water.

129. Their acts and omissions were objectively unreasonable and were undertaken with deliberate indifference to Plaintiff's serious medical needs.

130. As a direct and proximate result of the Deputy Defendants' unlawful acts and omissions, Plaintiff suffered damages, losses, and injuries in an amount to be determined by the jury at trial, including acute lithium toxicity and its neurologic and systemic complications, a

seven-day hospitalization, physical and mental pain and suffering, emotional distress, loss of enjoyment of life, physical impairment, and past and future medical expenses and economic loss.

131. Plaintiff is further entitled to punitive damages against the Deputy Defendants, in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of Plaintiff's constitutional rights.

132. Plaintiff is also entitled to his reasonable attorney fees and costs pursuant to C.R.S. § 13-21-131(3).

## V.

## DAMAGES

133. As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, and will continue to suffer, damages including past and future medical and related expenses; past and future economic losses, including lost earnings and impaired earning capacity; past and future noneconomic losses, including physical and mental pain and suffering, emotional distress, and loss of enjoyment of life; and physical impairment, all in amounts to be proven at trial.

## VI.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

A. Compensatory damages, economic and noneconomic, against all Defendants in amounts to be proven at trial, subject as to the County Defendants to the limits of C.R.S. § 24-10-114;

B. Against Defendants CorrHealth, PLLC, Health Advocates Network, Inc., and the Individual Provider Defendants, damages to the full extent permitted by law;

C. Against Defendant Gonzales, compensatory and punitive damages under 42 U.S.C. § 1983;

D. Against the Deputy Defendants, compensatory and punitive damages, and reasonable attorney fees and costs, pursuant to C.R.S. § 13-21-131;

E. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

F. Pre-judgment and post-judgment interest as allowed by law, including C.R.S. § 13-21-101;

G. Costs and expert-witness fees as allowed by law; and

H. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38(b).

Respectfully submitted this 9th day of September, 2026.

Respectfully submitted,

BRYAN & TERRILL

s/J. Spencer Bryan
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
333 W. Hampden, #420B
Englewood, CO 80110
Tele/Fax: (720) 923-2333
jsbryan@bryanterrill.com
*Attorneys for Plaintiff*